# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

———————————

CASE NO. 21-14214

———————————

RONDA SCOTT,

*Plaintiff/Appellant*,

v.

ADVANCED PHARMACEUTICAL CONSULTANTS, INC., and
CENTURION OF FLORIDA, LLC.,

*Defendants/Appellees*.

———————————————————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
HONORABLE ROBERT L. HINKLE
(5:19cv571-RH)

———————————————————————————

## APPELLANT'S INITIAL BRIEF

———————————————————————————

Richard E. Johnson
Law Office of Richard E. Johnson
314 West Jefferson Street
Tallahassee, Florida 32301
(850) 425-1997
rick@rej-law.com

Lisa C. Lambert
Law Office of Lisa C. Lambert
245 N. Highland Avenue
Suite 230-139
Atlanta, Georgia 30307
(404) 556-8759
lisa@civil-rights.attorney

**C-1**

**CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT**

Appellant/Plaintiff Ronda Scott, pursuant to FRAP 26.1 and 11th Cir. R. 26.1-1, 26.1-2 and 26.1-3, hereby files her Certificate of Interested Persons and Corporate Disclosure Statement:

1. Advanced Pharmaceutical Consultants, Inc. (Defendant)

2. Katherine Brezinski (Attorney for Defendant Advanced Pharmaceutical Consultants, Inc.)

3. Centurion Of Florida, LLC (Defendant)

4. Jennifer Corinis (Attorney for Defendant Centurion Of Florida, LLC)

5. Greenberg Traurig, PA (Attorneys for Defendant Centurion Of Florida, LLC)

6. Honorable Robert L. Hinkle (District Court Judge)

7. Jackson Lewis P.C. (Attorneys for Defendant Advanced Pharmaceutical Consultants, Inc.)

8. Richard E. Johnson (Attorney for Plaintiff)

9. Law Office of Richard E. Johnson (Attorney for Plaintiff)

10. Lisa C. Lambert (Attorney for Plaintiff)

11. Law Office of Lisa C. Lambert (Attorney for Plaintiff)

12. Catherine Molloy (Attorney for Defendant Centurion Of Florida, LLC)

13. Andrea Nieto (Attorney for Defendant Centurion Of Florida, LLC)

14. B. Tyler White (Attorney for Defendant Advanced Pharmaceutical Consultants, Inc.)

Defendant Centurion of Florida, LLC, is a wholly owned subsidiary of Centene Corporation, stock symbol: CNC.

**C-2**

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff/Appellant requests oral argument and submits that oral argument will assist the Court's disposition of this case in focusing on the issues and testing the basis and validity of the contentions of the Parties.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PARTIES AND
CORPORATE DISCLOSURE STATEMENT…………………………………….C-1

STATEMENT REGARDING ORAL ARGUMENT…………………………..C-2

TABLE OF CONTENTS……………………………………………………………...i

TABLE OF CITATIONS……………………………………………………….…iii

STATEMENT OF JURISDICTION……………………………………….…...vi

STATEMENT OF THE ISSUES………………………………………………..1

STATEMENT OF THE CASE..……………………………………………...2

STANDARD OF REVIEW…………….……………………………………21

SUMMARY OF ARGUMENT…………………………………..…………….…23

ARGUMENT……………………………………………………..………………26

I.   **JURY QUESTION ON LIABILITY OF BOTH DEFENDANTS UNDER PRIVATE WHISTLEBLOWER ACT**………………………….....26
     A.  Centurion's Joint Employer Status ………………………….…….26
     B.  Scott's Information Provision Qualifies As Protected Activity ……......28
     C.  Scott's Objection Is Protected Activity…………………………......30

II.  **JURY QUESTION ON LIABILITY OF BOTH DEFENDANTS UNDER PUBLIC WHISTLEBLOWER ACT**…..................................36
     A. APC Was A Contractor……...………………………........……36
     B. Disclosures in Written Reports Qualify As Protected Activity……........39
     C. Scott Participated in an Inquiry……………………………….......40
     D. Scott Made Complaints to Supervisory Officials……………………......42

III. **TRIAL COURT'S FAILURE TO PENALIZE SPOLIATION OF EVIDENCE**.................................................................43

CONCLUSION…………………………………………………………………...46

CERTIFICATE OF COMPLIANCE…………………………………………...48

CERTIFICATE OF SERVICE……………………………………………………48

## <u>TABLE OF CITATIONS</u>

### <u>U.S. Supreme Court cases:</u>

*Arlington Cent. School Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291 (2006)..….…37

*Reeves v. Sanderson Plumbing Prods., Inc*., 530  U.S. 133 (2000)…………...….22

*Tolan v. Cotton*, 134 S. Ct. 1861 (2014)…..………………….…...……………..….21

### <u>Federal Circuit Court cases:</u>

*Bates v. Harvey*, 518 F.3d 1233 (11th Cir. 2008)…………………………….....21

*Flury v. Daimler Chrysler Corp.*, 427 F.3d 939 (11th Cir. 2005)………...……….44

*Hinson v. Clinch County*, 231 F.3d. 821 (11th Cir.  2000)……...………...……….22

*Johnson v. Booker T. Washington Broadcasting Service, Inc*.,
    234 F.3d 501 (11th Cir. 2000)……………………………………...….……21

*Kingsland v. City of Miami*, 382 F.3d 1220 (11th Cir. 2004)………....................21

*Lyes v. City of Riviera Beach*, 166 F.3d 1332 (11th Cir.1999)…..……….……….26

*Stephens v. DeGiovanni*, 852 F.3d 1298 (11th Cir. 2017)……………...……….21

*Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*, 746 F.3d 1008 (11th Cir.2014)..…..33

### <u>Federal District Court cases:</u>

*Alabama Aircraft Indus., Inc. v. Boeing*, 319 F.R.D. 730 (N.D. Ala. 2017)….…..44

*Burns v. Medtronic, Inc*., No. 8:15-cv-2330-T17-TBM, 2016 U.S. Dist. LEXIS
    90435, 2016 WL 3769369 (M.D. Fla. July 12, 2016)…………………..35, 36

*Canelejo v. ADG, LLC*, No. 8:14-cv-17-T-MAP, 2015 U.S. Dist. LEXIS 109564,
    2015 WL 4992000 (M.D. Fla. Aug. 19, 2015)………………….......35, 36

*Graddy v. Wal-Mart Stores E., LP*,
    237 F. Supp. 3d 1223 (M.D. Fla. 2017)…………………………...….36

*Hernandez v. Publix Super Markets, Inc.*,
    11 F. Supp.3d 1177 (S.D. Fla.2014)…………………………….…….33

*Jones v. School Bd. of Orange County, Fla.*, No. 6:04-cv-540-Orl-31KRS,
    2005 U.S. Dist. LEXIS 36766, 2005 WL 1705504
    (M.D. Fla. July 20, 2005)……………………………………….....30, 42

*Luna v. Walgreen Co.*, 575 F. Supp.2d 1326, 1343 (S.D. Fla.2008) …….……….33

*Odom v. Citigroup Global Markets, Inc.*,
    62 F. Supp.3d 1330, 1336 (N.D. Fla. 2014)……………………….……….34

*Padron v. BellSouth Telecommunications, Inc.*,
    196 F. Supp.2d 1250 (S.D. Fla.2002)………………………….…….32, 33

*Ritenour v. AmeriGas Propane, Inc.*, No. 18-cv-80574, 2019 U.S. Dist. LEXIS
    43933, 2019 WL 2008675, at *6 (S.D. Fla. March 15, 2019)…….……….35

*Rivera v. Spirit Airlines, Inc.*, No. 19-62298-Civ-Scola, 2020 U.S. Dist. LEXIS
    15286, 2020 WL 491454 (S.D. Fla. Jan. 30, 2020)………………….…….35

*Shuck v. Clark*, Case No. 8:05-cv-2042-T-30TBM, 2007 WL 676198, 2007 U.S.
    Dist. LEXIS 14254 (M.D. Fla., March 1, 2007). …………….…....……….29

*Stillwell v. American Society for Metabolic and Bariatric Surgery, Inc.*,
    Case No. 1:20-cv-AW-GRJ, ECF No. 13 (N.D. Fla. June 24, 2020)…...….27

*Thomas v. Tyco Int'l Mgmt. Co., LLC*, 262 F. Supp. 3d 1328 (S.D. Fla. 2017)..…36

*Tillman v. Advanced Public Safety, Inc.*, No. 15-81782-CIV-MARRA, 2016 U.S.
    Dist. LEXIS 195657, 2016 WL 11501680 (S.D. Fla. Nov. 14, 2016)…...….35

*Villaman v. United Parcel Service, Inc.*, No. 18-21377-CIV, 2019 U.S. Dist.
    LEXIS 21845, 2019 WL 922704, *6 n. 2 (S.D. Fla. Feb. 8, 2019)………..36

*White v. Purdue Pharma., Inc.*, 369 F. Supp.2d 1335 (M.D. Fla.2005)….……….32

**State Court cases:**

*Aery v. Wallace Lincoln-Mercury, LLC,*
    118 So.3d 904 (Fla.4th DCA 2013) ...…………………………………33-36

*Diaz v. Impex of Doral, Inc.*, 7 So.3d 591 (Fla. 3d DCA  2009) …………………27

*Igwe v. City of Miami*, 208 So. 3d 150 (Fla. 3d DCA 2016) …………………...39

*Irven v. Dep't of Health and Rehab. Servs.*, 790 So. 2d 403 (Fla. 2001)……..28, 38

*Kearns v. Farmer Acquisition Co.*, 157 So. 3d 458 (Fla. 2d DCA 2015) ……34, 35

*Kogan v. Israel*, 211 So.3d 101 (Fla. 4th DCA 2017) ………………………...42-43

*Martin County. v. Edenfield*, 609 So. 2d 27 (Fla. 1992) …………..……28, 29, 38, 42

*Martinolich v. Golden Leaf Management, Inc.*,
    786 So.2d 613 (Fla. 3d DCA 2001)…………………………………....26, 27

*Pardo v. State*, 596 So.2d 665 (Fla.1992) …………………………………...…33

*Seagrave v. State*, 802 So.2d 281 (Fla.2001) ………………………..……………37

**Statutes:**

28 U.S.C. §1291…………………………………………………………..vii

28 U.S.C. §1292…………………………………………………………vii, 20

Fla. Stat. § 112.3187…………………………………...……………...…30, 39, 40, 42

Fla. Stat. § 448.102…………………………………...…………………26, 29, 41

Fla. Stat. § 456.065…………………………………...……………………....31

Fla. Stat. § 456.072…………………………………...……………………...…6, 7

Fla. Stat. § 458.3485…………………………………...…………..……....………31

Fla. Stat. § 464.016………………………………...…………….……………...……….6

Fla. Stat. § 464.018……………………………...…………….…………..……...31

Fla. Stat. § 465.016……………………………...…………….……………...……6, 8

Fla. Stat. § 465.023……………………………...…………………………...……….6

**Administrative Code:**

Fla. Admin. Code R. 64B9-15.002………………………...…… ………...…..….………31

Fla. Admin. Code R. 64B16-27.300…………………………….………....…...…7, 30

Fla. Admin. Code R. 64B16-27.420…………………….…………....…..………6

Fla. Admin. Code R. 64B16-27.820………………………...……….....…..………6

Fla. Admin. Code R. 64B16-28.120…………………………...………...…….……10

**Rules:**

Fed.R.Civ.P. 37………………………………...…………………….…..……..….44, 45

Fed.R.Civ.P. 50………………………………...……………………...…..…...…22

Fed.R.Civ.P. 54………………………...……………………..….……...…20

Fed.R.Civ.P. 56………………………….…...………………..……....21, 22, 26, 28

## <u>STATEMENT OF JURISDICTION</u>

This case is an appeal of a final decision of the United States District Court for the Northern District of Florida. Jurisdiction lies under 28 U.S.C. § 1291 and 28 U.S.C. § 1292(b).

## <u>STATEMENT OF THE ISSUES</u>

I.    Whether Centurion and APC were joint employers of Ronda Scott.

II.   Whether Scott's various expressions of objection and opposition to the conduct of APC and Centurion were protected activity under the public whistleblower act and/or the private whistleblower act.

III.  Whether APC qualifies as a contractor under the public whistleblower act.

IV.   Whether APC's spoliation of evidence should be addressed on remand.

## STATEMENT OF THE CASE

Plaintiff/Appellant Ronda Scott earned her Bachelor of Science in Pharmacy in 1988 and her Doctor of Pharmacy in 1989 from UGA Medical College. (ECF No. 56-1, Scott dep. at 32:18-33:2). She is licensed in both Florida and Georgia; her licenses have never been suspended and she has no history of professional discipline. (*Id*. at 33:3-12; ECF No. 62-1, Scott Dec. ¶ 2). As a licensed pharmacist, it is part of Ms. Scott's job to know, follow, and enforce the laws, rules and regulations concerning pharmacy practices. (ECF No. 62-1, ¶ 3).

Defendant Centurion of Florida contracts with Florida to provide medical and pharmaceutical services to inmates. (ECF No. 62-3, Centurion-Florida Contract). Centurion took over the contract from Corizon in 2016. (ECF No. 62-4 at 3 (8:8-16)). As part of the contract, Centurion is required to have a Consultant Pharmacist conduct monthly inspections and note any deficiencies in pharmacy operations; he or she acts as a third party overseer of Centurion's pharmacy services in the prisons. (ECF No. 62-3, Centurion-Florida Contract at 86; ECF No. 62-4 at 4 (13:3-16)). Centurion, in turn, contracted with Defendant Advanced Pharmaceutical Consultants (APC) to provide these services. (ECF No. 62-15). APC previously provided the same services to Corizon when it held the State contract. (ECF No. 56-3 at 16-17 (15:16-16:14)). Centurion was APC's client and APC wanted to maintain

2

a good relationship with their client. (ECF No. 56-1 at 46:11-18).

Ms. Scott started working for APC in February 2013 as the "Pharmacist in Charge" at Greenleaf Hospital and Counseling Center in Valdosta, Georgia. (ECF No. 56-1 at 35:2-14). Her immediate supervisor was Andrea Mason, and above Mason was the owner, Brian Bulfer. (*Id*. at 38:2-12). Eight months after her hire date, APC promoted Ms. Scott to the position of Regional Consultant Pharmacist for Region 1 of Florida's correctional institutions (CIs) or prisons pursuant to its contract with Corizon, and later, Centurion. (*Id*. at 35:15-36:25).

Region 1 stretches from Tallahassee to Pensacola; it included all CIs along the I-10 corridor which totals approximately 20 facilities. (*Id*. at 36:20-37:15, 40:4-7). In addition to the Region 1 prisons, Scott was responsible for approximately 4-6 private behavioral health hospitals. (*Id*. at 40:8-13, 41:8-12). The division of her labor between the prisons and private hospitals fluctuated weekly. (*Id*. at 40:15-41:7). APC originally estimated the prison work to be approximately 50% of Ms. Scott's time, but never actually calculated the exact amount of time between the public and private duties. (ECF No. 56-3, Mason dep. at 154-156 (153:22-155:1)[1].

As the Consultant Pharmacist for Region 1, Ms. Scott was tasked with

---

[1] Andrea Mason served as the Rule 30(b)(6) witness for Defendant APC. (ECF No. 56-3 at 12-13 (11:9-12:3)).

3

conducting monthly inspections of each prison and ensuring that laws, rules, and regulations were adhered to at the various correctional institutes. (ECF No. 56-1 at 36:10-15, 56:20-22). Her recommendations to the various facilities were part of her role as Consultant Pharmacist; it was within her duties and responsibilities to make these observations and provide her professional opinions. (*Id*. at 231:12-232:25). And, while Ms. Scott was not charged with supervising any of the staff at the various prisons, she did have the responsibility to ensure that licensed personnel were working in the pharmacies. (*Id*. at 235:13-16, 236:12-16).

As part of her inspections, Ms. Scott was required to complete various State mandated forms, such as the Monthly Inspection, MAR (Medication Administration Record) Review, medication counts and expiration tracking form, and temperature monitoring of refrigeration units. (ECF No. 56-1 at 58:18-25, 78:2-6, 79:1-3, 99:6-101:4; ECF No. 62-6; ECF No. 62-7). In addition, Scott had to complete the Centurion created CQI, Continuous Quality Improvement, form. (ECF No. 56-1 at 73:22-25, 74:9-23; ECF No. 62-5; ECF No. 62-7). The CQI form captures narratives of any variances or outliers during inspection, whether prior deficiencies have been corrected, and any other issue that may violate any laws, rules, regulations or otherwise jeopardize the pharmacy permit. (ECF No. 56-1 at 75:11-76:12, 77:3-16). There is no right or wrong way for the Consultant Pharmacist to document

deficiencies. (*Id*. at 108:6-12). After completing her inspection, Ms. Scott would conduct an exit interview with Director of Nursing (DON), Health Services Administrator (HSA), or nurse in charge of the pharmacy of the facility and go over her findings and discuss any corrective actions that were needed. (*Id*. at 65:8-66:1, 66:25-67:6). All of these inspection forms are transmitted to the State each month. (ECF No. 56-4, Fahmy dep. at 109-110 (108:1-109:7); ECF No. 62-25).

Shirly Fahmy, the Clinical Pharmacy director for Centurion of Florida, and Lisa Barton, Centurion's Regional Director of Nursing, supervised Ms. Scott's work at the prisons. (ECF No. 56-1 at 41:22-25, 45:7-23).

### **May 16, 2018 Inspection of Jackson Correctional Institute**

On May 16, 2018, Ms. Scott inspected Jackson Correctional Institution (JCI) and found numerous deficiencies. (ECF No. 56-1 at 96:4-7; ECF No. 62-7). Inventory was not correct on randomly checked items, medications were not within the expiration date or properly secured, and documentation of administered medicine was missing. (ECF No. 56-1 at 98:16-21, ECF No. 62-7 at 1). Epclusa, the medication for hepatitis C, had missing doses for inmates and nursing staff failed to document why the doses were missed and lab work was missing as well. (ECF No. 56-1 at 99:6-101:4, 109:14-25, 110:20-111:6; ECF No. 62-7 at 2, 3). The failure to accurately monitor and conduct lab testing for inmates undergoing hepatitis

treatment is a violation of § 465.016(1)(t), Fla. Stat. (ECF No. 62-1 ¶ 12). Medication count was not documented in April or May. (ECF No. 56-1 at 102:15-103:10; ECF No. 62-7 at 4). The staff failed to monitor the refrigerator temperature on three days. (ECF No. 56-1 at 103:11-17; ECF No. 62-7 at 5).

Further, an unlicensed medical assistant replaced an LPN and was providing medication to inmates which violates pharmacy regulations, F.A.C. §§ 64B16-27.420 and 64B16-27.820. (ECF No. 56-1 at 242:10-243:22, 244:3-15; ECF No. 62-7 at 3; ECF No. 62-1 ¶¶ 6-9). The replacement of licensed personnel with unlicensed personnel to manage the daily operation of the pharmacy, the use of unlicensed personnel to dispense drugs and counsel inmates about medications, and unlicensed personnel being left unsupervised within the pharmacy area with appropriate supervisory staff absent from the facility, are unlawful acts and subject to disciplinary action under §§ 456.072(1)(a-b) & (j), 464.016, 465.016(1)(c) and 465.023(1)(c), Fla. Stat. (ECF No. 62-1 ¶ 10).

In total, Ms. Scott listed 9 specific examples of deficiencies. (ECF No. 62-7 at 3). This inspection at Jackson was the worst facility that she had reviewed since becoming a consultant pharmacist; she thought the pharmacy permit could have been revoked that same day. (ECF No. 56-1 at 107:5-10). Scott noted in her comments that the JCI's pharmacy appeared to have a "complete system breakdown" based on

6

all of the deficiencies, and not specific to the reassignment of LPN Shirley Sims. (*Id*. at 106:22-107:1, 241:6-12; ECF No. 62-7 at 3). JCI's DON, Dorothy Stewart, was absent that day so Ms. Scott conducted the exit interview with JCI's HSA, Shelby Mixon, who did not disagree with any of the deficiencies observed by Scott. (ECF No. 56-1 at 101:9-23, 104:22-105:7, 108:13-16).

Not long after this inspection, Ms. Scott received a call from Andrea Mason, her supervisor, and Shirly Fahmy, Centurion's Clinical Pharmacy Director. (ECF No. 56-1 at 114:14-18). Ms. Mason told Scott that she was jeopardizing APC's contract with Centurion. (*Id*. at 114:21-115:2, 254:4-15). Ms. Fahmy was concerned about the findings regarding the Epclusa treatment because it was subject to a court order. (*Id*. at 115:5-8). Mason and Fahmy told Scott that she had to remove items "f" and "i" and the notation, "complete pharmacy operational breakdown," from her CQI form. (*Id*. at 114:10-15, 116:1-5, 117:16-22). Ms. Scott did not agree to these changes; however, she felt coerced to draft the amended form to save her job. (*Id*. at 118:2-7). She completed an "Amended" CQI Form on May 21, 2018. (ECF No. 62-1 ¶ 4; ECF No. 62-17 at 2). Fahmy and Mason ordering Scott to conceal her findings is a violation of §456.072, Fla. Stat. and F.A.C. § 64B16-27.300 (ECF No. 62-1 ¶¶ 5, 13). After the Amended CQI form was provided to JCI, DON Stewart signed off on the form as if she had been present the day of the inspection, but she was not; this

is unlawful pursuant to § 465.016(1)(j), Fla. Stat. (ECF No. 62-1 ¶ 11).

Ms. Scott contacted the Department of Health (DOH) that same month to ensure her license would be protected and informed Mason of her call to DOH on August 28, 2018. (ECF No. 56-1 at 118:7-119:24; ECF No. 62-13 at 33:13-20). Kim Williams, a nurse at Apalachee CI, later told Scott to "watch her back" regarding Fahmy and Barton. (ECF No. 56-1 at 251:14-18).

### Lortab Prescription at Santa Rosa Correctional Institute

In June 2018, a nurse at Santa Rosa CI could not reach Ms. Fahmy and called Ms. Scott to inquire about a prescription for Lortab for an inmate in a lot of pain; the doctor ordered Lortab 7.5 mg but the facility only had Lortab 5 mg tablets. (ECF No. 56-1 at 124:2-125:11). This was an "urgent situation." (*Id*. at 237:23-24). Scott told the nurse to give 1.5 tablets of the 5 mg of Lortab to equal the prescribed 7.5 mg. (*Id*. at 125:12-16). Lortab is scored to enable it to be broken in half; even if the table was not perfectly even on the break, it would not be significant enough to offset quality of patient care. (*Id*. at 238:2-8, 239:2-3). The remaining half tablet would then be noted on the narcotic log and locked up with the other controlled substances; Scott told the nurse she would handle it at her next inspection. (*Id*. at 125:19-126:12). Mason had a conversation with Scott about the pill splitting and they agreed that the preference would be not to have to split a pill but there are no rules or regulations

8

that prohibit the practice. (*Id*. at 127:11-22, 238:13-17).

Katie Curry, a nurse at Santa Rosa CI told Scott that Fahmy "hated her guts" and told her not to accept any recommendation from Scott. (ECF No. 56-1 at 252:6-10).

### Order to Stop Documenting Epclusa Issues

In August 2018, Ms. Scott told Mason that she was concerned about the lack of standardization for Epclusa storage and administration. (ECF No. 56-1 at 129:6-9). Epclusa is not a controlled substance but it is a very expensive drug. (*Id*. at 128:2-12). One portion of Scott's job is to ensure that all facilities utilize standard and uniform procedures. (*Id*. at 130:3-10). Ms. Fahmy told Mason that Scott should not have any concerns about Epclusa; Scott found this comment to be inappropriate and interfering with her responsibilities as the Consultant Pharmacist. (*Id*. at 136:2-19). Fahmy further stated that Scott should call before documenting a finding implying that Scott needed her permission to note a deficiency; this too, interferes with Scott's responsibilities. (*Id*. at 136:21-137:9, 141:5-13). Scott continued to document Epclusa issues for three reasons: (1) to protect her license; (2) she wanted to maintain consistency in her documentation; and (3) she wanted to have a clear picture of the handling of this drug at the end of the month to discuss any recommendations with Mason. (*Id*. at 163:11-164:13). Scott's "job is what's going right with the facility,

what's going well, what's not going well, and what do we do to fix it." (*Id*. at 164:14-16).

### Improper Epclusa Storage at Gulf Correctional Institute

On August 24, 2018 at Gulf CI, Ms. Scott observed that Epclusa was stored in a crash cart; this differed significantly from other facilities, where Epclusa was stored either with controlled substances or was maintained in a separate mounted container, violating F.A.C. § 64B.16-28.120. (ECF No. 56-1 at 168:10-169:1; ECF No. 62-1 ¶ 14). Scott asked the nurse if she had any concerns when reviewing the CQI form during the exit interview and the answer was "no." (ECF No. 56-1 at 153:1-5). But the nurse emailed her DON about the finding and Fahmy once again contacted Mason to complain about Scott documenting anything to do with Epclusa. (*Id*. at 149:11-150:19).

Approximately 30 minutes after Ms. Scott left Gulf CI, Mason called and told Scott to eliminate all recommendations regarding Epclusa on her August reports. (ECF No. 56-1 at 150:20-151:2). As soon as she got off the phone with Mason, Scott emailed the administrative assistant that she had to amend her CQI inspections based on Mason's directive. (*Id*. at 151:2-6, 169:14-17; ECF No. 62-21). Scott confirmed to Mason that she would amend all CQI forms the following week. (ECF No. 62-21 at 2).

### Scott Properly Secured Expired Tramadol

On March 20, 2018, Ms. Scott located expired Tramadol at the Wakulla Correctional Institute and prepared the shipping information to properly dispose of the drug. (ECF No. 62-1 ¶ 15; ECF No. 62-2 at 2). After preparing the shipping information, she handed it off to a nurse to box up and ship. (ECF No. 56-1 at 166:2-14, 173:1-3). However, she learned on August 28, 2018 that the facility never mailed the package and noted this in her Narcotic Accounting Log report. (ECF No. 62-1 ¶ 15; ECF No. 62-2 at 1). Scott addressed this issue with the HSA at the facility, that the Tramadol was not timely shipped – for months – without Scott's knowledge. (ECF No. 56-1 at 183:8-14).

### August 28, 2018 Phone Conferences

Ms. Scott had two phone conferences with her supervisor, Andrea Mason, on August 28, 2018; she recorded these calls because she felt as though her job was being threatened and she wanted to have a clear picture of the conversations. (ECF No. 56-1 at 155:8-13, 156:2-5). During the first call, Scott informed Mason that she went to the DOH; Mason demanded to know the names of the DOH investigators. (*Id*. at 157:18-25, 171:16-172:9). Mason "was concerned" that Scott went to DOH and said it was "jeopardizing [APC's] contract with Centurion." (ECF No. 62-13 at 33:2-8). She was "shocked" that Scott went to the DOH. (*Id*. at 33:9).   They

discussed Fahmy's requirement to stop documenting Epclusa and call her before making findings; Mason claimed it was not a cover up just that she wanted to advise before "process changes." (ECF No. 56-1 at 158:6-20, 160:7-18). But Fahmy never provided any documentation regarding policy or procedure changes regarding Epclusa. (ECF No. 56-1 at 158:21-23). Ms. Scott told Mason that she was being targeted by Fahmy. (ECF No. 62-13 at 10:2-7).

They had a second call that same day with Krista Angell, a human resources representative for APC, because of Scott's claims of retaliation. (ECF No. 56-1 at 170:11-171:8; ECF No. 62-13 at 10:2-7). Ms. Scott repeated the issues regarding retaliation and being targeted by Fahmy and Barton since her May 2018 inspection at JCI and their interference with Scott's duties. (ECF No. 56-1 at 177:20-23, 178:15-21, 181:5-8; ECF No. 62-13 at 10:22-11:6, 13:21-14:1, 27:14-20, 39:16-19, 41:20-42:5). Scott told them that what Fahmy and Barton were doing to her was illegal. (ECF No. 56-3, Mason dep. at 144 (143:2-13)). Scott reiterated her concern that Centurion was moving nurses out of the pharmacies and replacing them with CNA's and medical assistants. (ECF No. 62-13 at 29:17-25). Scott told them that Fahmy asking to remove her from Wakulla CI was retaliation. (*Id*. at 37:10-38:7). Mason remarked that APC will "obey what the client has asked us to do." (*Id*. at 38:11-16). Mason reiterated that she wants Scott to call or email her but to refrain

12

from listing issues on the inspection reports. (*Id*. at 43:17-25).

The conversation ended with no one saying Scott would be disciplined. (ECF No. 56-1 at 177:18-20, 181:5-8; ECF No. 56-3 at 144 (143:14-25)). In fact, it ended with Mason asking Angell for the next steps and that it was a "helpful" conversation; Angell suggested that Mason draft a summary of the conversation and agreements so that it will be memorialized for Scott to refer to going forward and Mason said it "sounds like a great plan." (ECF No. 62-13 at 48:18-50:3).

### **Final Written Warning & Removal From Prisons**

The day after the conference calls, on August 29, 2018, Mason issued Scott a "Final Written Warning" regarding her alleged deficiencies in performance. (ECF No. 62-9). At no point prior to this time did Mason tell Scott that she was "counseling" her with a "verbal warning" under APC's progressive discipline process. (ECF No. 56-3 at 149 (148:8-19)). This Final Warning by-passed a suspension on the progressive discipline; and it only pertained to the prisons. (*Id*. at 150, 152 (149:23-25, 151:1-6)). The discipline states that Centurion agreed to give Scott one more chance and to continue working in the prisons in September. (*Id*. at 151 (150:15-16); ECF No. 62-9 at 2). APC believes that Centurion has the right to ask APC to remove a Consultant Pharmacist from the prisons and APC has an obligation to Centurion as their client. (ECF No. 56-3 at 154, 189 (153:6-21, 188:3-

6)).

Ms. Scott emailed Bulfer a grievance regarding the discipline on August 30, 2018, asking for Mason to be removed from her chain of command. (ECF No. 56-1 at 186:23-187:5; ECF No. 62-10). Bulfer responded that if she is continuing inspections that day, she should to "stick to the form;" he also noted that APC is "rapidly expanding again" and he wants to make sure she can handle the workload, and that they are going to replace her car. (ECF No. 62-11). Bulfer also exchanged emails with Mason, saying Scott is not going to lose her job and he has never heard of any complaints about Scott. (ECF No. 56-3 at 162-163 (161:16-162:5); ECF No. 62-18). Scott's response to the discipline noted it was incomplete, inaccurate, retaliatory, her reports were protected activity. (ECF No. 62-12 at 2). Scott asked for full disclosure of alleged complaints or investigations about her and wanted reinstatement to the Consultant Pharmacist position. (*Id*.).

As of 4:02 p.m. on Friday, August 31, 2018, Scott was to continue her work at the prisons. (ECF No. 62-19). After this time, Mason had a phone call with Fahmy who reported that Scott was sending amended CQI forms to the prisons. (ECF No. 62-20). Mason ordered Scott to amend these CQI forms and did not tell Fahmy of her directives, let alone Bulfer; instead she described this as a "serious situation" to Bulfer. (ECF No. 56-3 at 167-170, 174-175 (166:21-167:21, 168:20-169:12, 173:16-

174:4)). Further, the directive to amend the CQI forms was not just from Mason, but the "clinical pharmacy director of Centurion," or Fahmy herself. (*Id*. at 175 (174:1-4)). Fahmy and Mason were also concerned that Scott requested May inspection forms from a facility; however, Mason never confirmed this alleged act with Scott. (*Id*. at 170, 172 (169:17-21, 171:16-19)). On this same day, August 31, 2018, Fahmy requested Scott's removal and Mason obliged her request. (*Id*. at 175, 178-79 (174:11-25, 177:23-178:17)).

Scott was not given one more chance by Centurion after the Mason-Fahmy phone call; she was removed from all prisons the Tuesday after Labor Day, September 4, 2018. (ECF No. 56-1 at 182:2-6, 185:12-23). Mason told Scott she was removed from the facilities; however, this was done at the direction of Centurion. (*Id*. at 247:21-23). Mason emailed Bulfer the same day stating they had to decide whether to demote or terminate Scott and that she was putting together a timeline since she believed Scott was working with an attorney. (ECF No. 56-3 at 182-183 (181:25-182:24); ECF No. 62-22).

### Ridgeview Hospital

Ms. Scott remained in the Panhandle for the last week in August to complete her prison inspections and amend her CQI reports as directed by Mason. (ECF No. 56-1 at 189:14-25). She was originally scheduled to go to a new APC private facility,

Ridgeview Hospital in Smyrna, Georgia, on August 31, 2018. (*Id*. at 190:1-10, 193:17-22). However, she rescheduled her arrival with Beth Patrick, the recruiter for APC, to the following week. (*Id*.; ECF No. 62-14). Scott's visit to Ridgeview was to introduce herself to the administrative officials – not a scheduled meeting at a specific time – and to assist the pharmacist in charge in completing orders; the introductions did not happen as everyone at the facility was preparing for a joint commission accreditation inspection. (ECF No. 56-1 at 206:1-5, 207:11-24, 211:15-19, 212:1-6). APC later baselessly claimed that Scott arrived late to the facility and violated its attendance policy. (ECF No. 56-3 at 123 (122:12-22)). Mason's only documentation that Scott was to arrive on August 31 was Scott's own email; however Mason was not privy to conversations between Patrick and Scott. (*Id*. at 124, 130 (123:16-25, 129:17-21)). And in fact, Patrick's email to Scott requesting assistance noted that she was to arrive the following week with no specific arrival time. (*Id*. at 128-129 (127:14-128:6, 130:2-19); ECF No. 62-14).

**<u>Termination</u>**

APC terminated Scott's employment on September 10, 2018. (ECF No. 56-1 at 213:5-7). Ms. Scott alerted the pharmacist in charge of the facilities she inspected that she was terminated. (ECF No. 56-1 at 216:7-13). Mason was the sole decision maker for the termination. (ECF No. 56-3 at 176 (175:1-16)). Mason did not provide

any written reasons for Scott's termination. (*Id*. at 196 (195:4-7); ECF No. 62-23). She claims that there were performance issues and she was insubordinate; however, these were allegations levied by Fahmy and refuted by Scott. (ECF No. 56-3 at 196 (195:13-20)). Mason also claims that half of Scott's job was gone after she was "not permitted to go back into the prisons" and they could not supplement the rest of her schedule. (*Id*. at 196 (195:13-20)). But Bulfer said they were rapidly expanding. (ECF No. 62-11). APC never offered Scott work on a half-time basis. (ECF No. 56-3 at 197 (196:10-13)). Mason claimed that there were issues of Scott not following through on policy revisions; however, this is untrue, Scott alerted her each time a facility's annual reviews were complete. (*Id*. at 196 (195:22-24); ECF No. 62-1 ¶ 17).

### Post-Termination Digging Up Dirt

Scott disputes the claims that she was responsible for expired drugs at Franklin CI and Calhoun CI; there are no facts regarding where the drugs were stored or possibly hidden. (ECF No. 56-1 at 218:21-219:8, 219:17-21). Plus, identifying expired drugs is the responsibility for all medical staff, not just the Consultant Pharmacist, and it's not uncommon that expired drugs are missed or overlooked. (*Id*. at 217:14-18, 218:11-17). As for the allegation that she failed to order temperature data loggers, Scott has no idea what these even are and was unaware of any request

to order these. (*Id*. at 220:3-19). Finally, Mason admits to reviewing Scott's files and her subordinates reporting any *alleged* deficiencies by Scott – *after* her termination – which Mason then logged for her files. (ECF No. 56-3 at 80-82, 83-91 (79:16-81:8, 82:4-90:19); ECF No. 62-16).

### Spoliation

APC was aware that Scott levied complaints with the Florida Department of Health as of August 28, 2018. (ECF No. 56-3 at 228 (227:18-20)). As of September 4, 2018, Mason told her supervisors that she has "to put together a timeline of events since she is most likely working with an attorney." (ECF No. 62-22). Mason's work experience led her to believe that Scott had an attorney because of Scott's claims of being targeted and retaliated against. (ECF No. 56-3 at 183, 227-228 (182:16-24, 226:24-227:4)). APC does not have any document retention policy. (*Id*. at 228 (227:5-8)). But despite believing the Scott had retained a lawyer regarding her complaints of retaliation, APC made no attempt to retain Scott's emails after her termination. (*Id*. at 228 (227:9-11)). In fact, the opposite is true, APC deleted all of Scott's emails on December 26, 2018. (ECF No. 62-24 at 5-6, Amended Response to No. 8).

### Course of Proceedings Below

Plaintiff Ronda Scott filed her initial Complaint on December 27, 2019,

18

alleging whistleblower retaliation claims against both Defendant APC and Defendant Centurion under federal and state law, as well as intentional interference with advantageous business relations under state law against Centurion. (ECF No. 1). On March 6, 2020, APC filed an unopposed motion to stay the proceedings to mediate the claims; the District Court granted the motion. (ECF Nos. 6, 7). Mediation was held on April 27, 2020; however, it ended in an impasse. (ECF No. 9). Each Defendant filed its Answer on June 26, 2020. (ECF Nos. 19, 20). Discovery ensued and due to a discovery dispute regarding Ms. Scott's mental health records, she filed a Petition for Writ of Mandamus with this Court on May 18, 2021; this Court denied the Petition on June 14, 2021. (ECF Nos. 51, 54).

At the close of discovery, both Defendants moved for summary judgment as to all counts. (ECF Nos. 55, 58). Ms. Scott opposed the motions and Defendants filed their reply briefs. (ECF Nos. 60, 62, 65, 66). The District Court held a hearing regarding the summary judgment motions on July 29, 2021. (ECF Nos. 68, 125). On August 6, 2021, the District Court entered an Order granting summary judgment as to all whistleblower counts against APC and Centurion but denied summary judgment as to Ms. Scott's intentional interference with advantageous business relations under state law against Centurion. (ECF No. 70). Ms. Scott and Centurion then prepared for trial and filed motions in *limine* and the pretrial stipulation. (ECF

Nos. 75-82, 88). The District Court held the pretrial conference on August 30, 2021 and continued the trial date to permit another mediation between Ms. Scott and Centurion. (ECF Nos. 100, 105). This mediation also ended in impasse. (ECF No. 104).

The District Court subsequently issued a new Order regarding summary judgment on November 5, 2021, noting it "is identical to the August 6, 2021 order but for the title, this footnote, the insertion of sections VIII and IX, and corresponding changes to the ordering paragraphs on page 20. Section VIII directs the clerk to enter judgment under Federal Rule of Civil Procedure 54(b). Section IX makes findings under 28 U.S.C. § 1292(b)." (ECF No. 106 at 1, n.1). The Order directed judgment under Rule 54(b) in favor of APC and Centurion as to all whistleblower claims; judgment was entered the same day. (ECF Nos. 106, 107). The Order certified Ms. Scott's intentional interference claim under § 1292(b) after denying Centurion's motion for summary judgment as to this claim. (ECF No. 106). Centurion never applied for leave with this Court to seek discretionary review of the denial of summary judgment. Ms. Scott timely filed her Notice of Appeal to this Court on December 1, 2021. (ECF No. 114).

## STANDARD OF REVIEW

Summary judgment is not appropriate except where there exists no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). Courts review all evidence and reasonable factual inferences drawn therefrom in the light most favorable to the party opposing the motion. *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 507 (11th Cir. 2000). Issues of fact and sufficiency of evidence are properly reserved for the jury. The only issue to be considered by the judge at summary judgment is whether the plaintiff's evidence has placed material facts at issue. All material fact disputes must be resolved in Plaintiff's favor; her evidence must be believed so that her "best case" is before the Court. *Stephens v. DeGiovanni*, 852 F.3d 1298, 1313-14 (11th Cir. 2017), quoting *Bates v. Harvey*, 518 F.3d 1233, 1239 (11th Cir. 2008). Review of a grant of summary judgment is *de novo*. *See Kingsland v. City of Miami*, 382 F.3d 1220, 1225 (11th Cir. 2004).

The Supreme Court has taken notice of the fact that lower courts are not following the standards articulated above. The court granted certiorari and, without briefing or argument, summarily reversed a summary judgment that committed those alarmingly common errors. *Tolan v. Cotton*, 134 S. Ct. 1861 (2014). The opinion

below falls squarely within the category of errant grants of summary judgment addressed in *Tolan*.

In the decision most germane to this case, the Supreme Court reiterated and strengthened the rule that the court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc*., 530  U.S. 133, 150-151 (2000) (discussing standard for granting judgment as a matter of law under Fed.R.Civ.P. 50, which is the "same" as the standard for granting summary judgment under Rule 56).  The Supreme Court has offered an additional important insight into the rule.  "[T]he court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Id*.  (Citations omitted). In other words, courts must consider the entire record, but "disregard all evidence favorable to the moving party that the jury is not required to believe." *Id*. at 2102.  This Court, as it must, completely endorses and adopts the *Reeves* standards.  *See Hinson v. Clinch County*, 231 F.3d. 821, 827 (11th Cir.  2000).

## SUMMARY OF ARGUMENT

Both Defendants are liable under the Florida Private Whistleblower Act.

The court below, by bare assertion, and without any explanation or analysis, simply declared that Centurion was not a joint employer with APC of Scott. But the facts and the caselaw support Centurion's status as a joint employer. Centurion contracts with the state to operate health care services for the state prisons. APC, in turn, contracts with Centurion to provide consultant pharmacist services to those prisons. APC's contract is indirect, but its role is dictated by the state. The law does not permit Centurion to escape the strictures of the whistleblower law merely by outsourcing certain functions. Scott worked on Centurion's premises and under its direction. She monitored Centurion's pharmacies under Centurion's checklist and standards. Centurion dictated what she did when she visited the prisons and where she did it and with whom.

Scott's complaint to the Department of Health is protected activity under the Act. The trial court erred in finding that the questions of DOH were not an inquiry because they arose in a call initiated by Scott instead of, for example, a follow-up call initiated by DOH. That is a meaningless distinction – one that flies in the face of the liberal construction mandate and the rule requiring inferences to be drawn in favor of the non-moving party.

23

Scott's objections in her written reports qualify as protected activity, including her complaint of improper drug storage at a prison pharmacy. The court misreads the examples listed in an administrative rule as an exhaustive list of medication violations in a pharmacy, apparently missing the language that introduces the list with, "including, but not limited to." The court below also missed the catch-all category at the end of the list that would logically include improper drug storage. Moreover, the court left unaddressed Scott's complaint about improper staffing of a prison pharmacy, though there is a statute squarely on point. Scott complained about actual violations of at least two laws, rules, or regulations. Moreover, there can be no question that Scott at least had a good-faith belief that these were violations of laws, rules, or regulations.

The liability of both Defendants under the Florida Public Whistleblower Act is also a jury question that is not subject to determination on summary judgment.

The court below erred in finding APC immune from the act because it has a subcontract rather than a prime contract with the Department of Corrections. The court presumed to amend the statute by inserting the word "prime" or the word "general" before the word "contractor." But one need be only a contractor, not any particular sort of contractor. A subcontractor is a contractor. This is so with stronger reason where the State requires Centurion to hire some company such as APC to

24

monitor and inspect its pharmacies.  If the law were otherwise, Centurion could escape responsibility for any violation perpetrated in its health care facilities by simply outsourcing those functions.

The summary judgment order ignored the fact that the public whistleblower statute protects an employee who complains about the violations of any covered entity, regardless of whether the offending entity is her employer or not.  The direct employer may not punish an employee for protected speech about the violations of another organization.

In the summary judgment proceedings, Scott briefed APC's spoliation of critical evidence in the form of Scott's company email account.  APC deleted these emails even after an APC manager wrote that she was working, "to put together a timeline of events since she is most likely working with an attorney."  So the evidence was destroyed with reasonable belief that litigation was coming.  The emails would have been critical evidence in many respects – evidence that could not be had from any other source. The trial court simply ignored this part of the summary judgment briefing.  On remand, this court should direct that the spoliation be addressed.

## ARGUMENT

## I.    JURY QUESTION ON LIABILITY OF BOTH DEFENDANTS UNDER PRIVATE WHISTLEBLOWER ACT

### A. Centurion's Joint Employer Status

The court below dismissed the private whistleblower count against Centurion because the statute applies only to legal violations "of the employer" (citing § 448.102, Florida Statutes).  ECF No. 106 at 7.  Scott argued that Centurion was a joint employer and thus covered by the statute.  The court below cursorily dismissed this without explanation, writing, "Ms. Scott asserts Centurion should be deemed her joint employer, but the facts do not support the assertion." *Id*. That one sentence is the totality of the court's treatment of the joint employer issue – a simple claim, without explanation that "the facts do not support" Centurion's joint employer status. Fed.R.Civ.P. 56(a) states, "The court should state on the record the reasons for granting or denying the motion."  The court stated no reasons for its ruling on this important point, despite the facts and authorities Scott presented in opposition to summary judgment.

Centurion qualifies as a joint employer with APC.  *Martinolich v. Golden Leaf Management, Inc*., 786 So.2d 613 (Fla. 3d DCA 2001), followed the doctrine of *Lyes v. City of Riviera Beach*, 166 F.3d 1332, 1341 (11th Cir.1999), in applying joint employer doctrine to a situation like the present one, "where two entities contract

26

with each other for the performance of some task, and one company retains sufficient control over the terms and conditions of employment of the other company's employees."  The operations of Centurion and APC are sufficiently intertwined to make it at least a jury question as to whether the two companies were joint employers of Ronda Scott.  *Martinolich* itself reversed the trial court for not letting the question go to the jury, as did *Diaz v. Impex of Doral, Inc*., 7 So.3d 591 (Fla. 3d DCA  2009).  Another judge in the court below reached the same conclusion.  *Stillwell v. American Society for Metabolic and Bariatric Surgery, Inc.*, Case No. 1:20-cv-AW-GRJ, ECF No. 13 (N.D. Fla. June 24, 2020).

The two companies are too closely interrelated to escape coverage under any of the laws in this Complaint.  Centurion contracts with the state to operate health care services for the state prisons.  APC, in turn, contracts with Centurion to provide consultant pharmacist services to those prisons.  APC's contract is indirect, but its role is dictated by the state, as confirmed by Centurion's Senior Vice President for Operations, Victoria Love, in her deposition.  Ms. Love testified that the contract between Centurion and the state requires Centurion to retain an independent outside consulting pharmacist to monitor the prison pharmacies.  This outsourcing exists to provide objectivity to the monitoring. ECF No. 62-4, Love depo at 4 (13:3-16). So the contract between Centurion and APC is mandated by the State of Florida through

27

its contract with Centurion.  The APC/Centurion contract is thus a state-mandated contract even if it is not formally a state contract.  The law does not permit Centurion to escape the strictures of the whistleblower law merely by outsourcing certain functions.  Scott worked on Centurion's premises and under its direction.  She monitored Centurion's pharmacies under Centurion's checklist and standards. Centurion dictated what she did when she  visited the prisons and where she did it and with whom.

The Supreme Court of Florida has instructed courts to construe the Florida Whistleblower Act (FWA) broadly and to favor access to its remedy. *Irven v. Dep't of Health and Rehab. Servs.*, 790 So. 2d 403, 406 (Fla. 2001); *Martin County. v. Edenfield*, 609 So. 2d 27, 29 (Fla. 1992).  The compliance monitoring of prison pharmacies can be quite literally a matter of life or death.  These functions are at the very heart of the public health, safety, and welfare that the Act is designed to protect. The law cannot be read in so crabbed a fashion as to exclude APC employees from its protection.

**B.** **Scott's Information Provision Qualifies As Protected Activity**

In the course of finding Scott's activity not protected under the statute, the trial court was creative in ways that seem not to comport with the mandate of Rule 56 to draw inferences for the non-moving party and the mandate of the statute for liberal

construction to afford access to the remedy. Section 448.102(2) protects an employee who has "provided information to, or testified before, any appropriate governmental agency, person, or entity conducting an investigation, hearing, or inquiry into an alleged violation of a law, rule, or regulation by the employer." The court reads into this statute a requirement that the inquiry being conducted must be at the agency's initiative. In accordance with this self-made amendment, the court excludes Scott's telephone call to the Department of Health to report violations of law, rule, and regulation by both Centurion and APC because, "[a]t the time of the call, the Department was not conducting an inquiry, let alone an investigation or hearing." ECF No. 106 at 8. But common sense, to say nothing of liberal construction, forbids reading in that sort of restriction. If the Department had called back in a day or two and asked Scott some questions, nobody would dispute that was an inquiry by the Department. But since the Department asked the questions in the call Scott initiated, the court below reaches a different conclusion. That violates simple linguistics as well as the reasoning Florida courts have applied to the counterpart public whistleblower statute. *See Martin County v. Edenfield*, 609 So.2d 27 (Fla. 1992) (disclosures made in discussions with County Commissioners qualify under the statute as protected activity); *Shuck v. Clark*, 2007 WL 676198 (M.D. Fla. 2007) (verbally disclosing actual or suspected violations of laws or rules during

29

interview with the defendant's City's Employee Relations Department qualifies under the Act); *Jones v. School Bd. of Orange County, Fla*., 2005 WL 1705504 (M.D. Fla. 2005) (a non-disciplinary, "troubleshooting" meeting with management counts as an "inquiry" under § 112.3187(7), Florida Statutes).

### C. <u>Scott's Objection Is Protected Activity</u>

The trial court concedes that Scott objected to violations of law concerning improper staffing of a prison pharmacy and improper storage of the drug Epclusa. ECF No. 106, at 8-9 (citing statute and code sections). The court further concedes that "APC and Centurion required Ms. Scott to delete the reference to improper staffing." *Id*. at 9. The summary judgment order then embarks on a course of Talmudic casuistry that begins with the premise that Ms. Scott's being ordered to leave the violations off her monitoring form (or to remove it) was a violation of law. The court moves from there to the assumption that the whistleblower violation rests on the premise that the information was required to be reported.  But the issue is whether Scott had a right to report the violation, not whether she had a duty.  If she was punished for exercise of her right to report, the duty is not part of the package. Next the court looks at Florida Administrative Code Rule 64B16-27.300 and finds various requirements but no specific mention of improper drug storage on the list of "quality related events."  But, please, not so fast.  The court notes that a "quality

related event" is defined as the "inappropriate dispensing or administration of a prescribed medication." ECF No. 106 at 9, citing *id*., at .300.2. But that is an incomplete quotation that leaves off the words, "including, but not limited to." That is a significant omission in that it portrays as an exhaustive list what is really a list of illustrative examples. The rule in no way excludes improper storage of drugs from the category of "quality related event."[2] Indeed, it is common knowledge that improper storage can totally rob a drug of its effectiveness or make it vulnerable to theft, or even make it dangerous. Epclusa is an expensive and sought-after drug for which proper storage ought to be major consideration.

Moreover, the court mentions without discussing Scott's complaint about improper staffing of a prison pharmacy. *See* Fla. Stat. § 456.065(1); *id*. § 464.018(1)(r); *see also* Fla. Admin. Code R. 64B9-15.002(5) (addressing supervision of certified nursing assistants); Fla. Stat. § 458.3485(2) (addressing supervision of medical assistants). The court seemed to lose sight of this violation after mentioning it. The summary judgment order never addresses it again nor explains in any way why this is not enough of a violation of law to meet the standard.

---

[2] The rule does cite "Clinical abuse/misuse" as a sort of generic quality related event at the bottom of a list that covers most other common items, showing an intent to have a catch-all category. *Id*. .300(b)7.

Thus, there were two actual violations of laws, rules, or regulations that the summary judgment order erroneously discounted.  But even if somehow these were not actual violations, they were at least matters  that Scott believed in good faith to be violations of a law, rule, or regulation.  Based on its expurgated version of the administrative rule, the court below disclaimed the relevance of the good-faith belief standard, but it is relevant if one takes in the whole picture.  It is time for this Court to weigh in.

For many years, courts disagreed over the "actual violation" versus "good-faith belief" standards. Courts favoring the former standard followed the line of cases represented by *White v. Purdue Pharma., Inc.*, 369 F. Supp.2d 1335, 1337 (M.D. Fla.2005) ("[A] Plaintiff, in order to prevail under a Florida Whistle-Blower action ... must prove that the activity, policy or practice objected to is, in fact, in violation of a law, rule or regulation."). Courts favoring the latter standard followed the line of cases represented by *Padron v. BellSouth Telecommunications, Inc.*, 196 F. Supp.2d 1250, 1256 (S.D. Fla.2002) ("Statutorily protected participation is established if Plaintiff can show that she opposed an unlawful employment practice which she reasonably believed had occurred").

The Florida appellate courts had not ruled. This left the federal courts and the state trial courts to go their own way, with no binding precedent. Where no Florida

32

Supreme Court precedent exists on a matter, federal courts are bound to adhere to the decisions of the state's intermediate appellate courts absent some persuasive indication the state's highest court would decide the issue otherwise. *Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*, 746 F.3d 1008, 1021 (11th Cir.2014). The Supreme Court of Florida has held that "decisions of district courts of appeal represent the law of Florida unless and until they are overruled by this Court." *Pardo v. State*, 596 So.2d 665, 666 (Fla.1992).

A Florida appeals court finally ruled in *Aery v. Wallace Lincoln-Mercury, LLC,* 118 So.3d 904, 916 (Fla.4th DCA 2013), that "all that is required is that the employee have a good faith, objectively reasonable belief that h[is] activity is protected by the statute." (bracket in original) (quoting, *Luna v. Walgreen Co*., 575 F. Supp.2d 1326, 1343 (S.D. Fla.2008).

Federal courts began to fall in line behind *Aery*. *See, e.g., Hernandez v. Publix Super Markets, Inc*., 11 F. Supp.3d 1177 (S.D. Fla.2014) ("*Aery* is the only Florida intermediate appellate court to have addressed the standard of proof in a FWA claim. As a federal court applying state law, the Court is bound to adhere to decisions of the state's intermediate appellate courts absent some persuasive indication that the state's highest court would decide the issue otherwise") (internal quotation marks

omitted); *Odom v. Citigroup Global Markets, Inc*., 62 F. Supp.3d 1330, 1336 (N.D. Fla. 2014) ("*Aery* is the only binding Florida state court authority on the matter.").

Some confusion arose from the decision in *Kearns v. Farmer Acquisition Co*., 157 So. 3d 458 (Fla. 2d DCA 2015). After devoting 1,401 words to arguing that *Aery* was wrongly decided, the *Kearns* court went on to explain that the plaintiff's good-faith reasonable belief was irrelevant to the case at hand because there was a jury question on the existence of an actual violation.

> [W]e agree with the Employer that under section 448.102(3) Kearns must prove that he objected to an actual violation of law or that he refused to participate in activity that would have been an actual violation of law. Thus, we are not persuaded by the Fourth District's opinion in *Aery*. However, the issue of which standard applies is not determinative because we conclude Kearns presented evidence that, when viewed in the light most favorable to him, establishes an actual violation of the law.

*Id*., 465. The court could have simply said "there is an actual violation so we need not discuss whether a good-faith reasonable belief would have been enough," instead of penning 1,401 words of dicta challenging *Aery*.

Predictably, employers seized upon *Kearns* as a decision creating conflict with *Aery*, thus allowing federal courts and state trial courts outside the 2d DCA and 4th DCA to choose between the two outcomes until the Florida Supreme Court could resolve the split. But there was no real split because the *Kearns* court's analysis was merely a prediction of how a future case might be decided if that same three-judge

panel happened to reassemble to hear a similar case in the future. The finding of an actual violation (or at least a jury question requiring remand on the actual violation) made the *Aery* discussion irrelevant to the *Kearns* outcome. Magistrate Judge Pizzo laid out this argument in *Canelejo v. ADG, LLC*, 2015 WL 4992000 (M.D. Fla. Aug. 19, 2015). After quoting the *Kearns* court's own language that "which standard applies is not determinative," the court identified the language disagreeing with *Aery* as "dicta," adding:

> "[D]icta is not binding on anyone for any purpose." *Edwards v. Prime, Inc*., 602 F.3d 1276, 1298 (11th Cir.2010) (citing *McNely v. Ocala Star-Banner Corp*., 99 F.3d 1068, 1077 (11th Cir.1996) ("[W]e are not required to follow dicta contained in our own precedents...."); *Great Lakes Dredge & Dock Co. v. Tanker Robert Watt Miller*, 957 F.2d 1575, 1578 (11th Cir.1992) (because what is said in a prior opinion about a question not presented there is dicta, and dicta is not binding precedent, a later panel is "free to give that question fresh consideration")). Therefore, *Kearns* does not constitute an intervening change in controlling law on whether the FWA requires a plaintiff to prove an actual violation.

*Id*., *2; *accord*, *Burns v. Medtronic, Inc*., 2016 WL 3769369 (M.D. Fla. July 12, 2016) ("*Aery* remains the controlling law on the issue because the actual violation standard in *Kearns* was discussed in dicta."); *Rivera v. Spirit Airlines, Inc*., 2020 WL 491454, *2 (S.D. Fla. January 30, 2020) (noting the conflict with *Kearns* and applying *Aery* as binding); *Ritenour v. AmeriGas Propane, Inc*., 2019 WL 2008675, at *6 (S.D. Fla. March 15, 2019) (applying *Aery* as controlling law); *Tillman v.*

*Advanced Public Safety, Inc*., 2016 WL 11501680, at *4 n. 1 (S.D. Fla. Nov. 14, 2016) (Marra, J.) (same); *Thomas v. Tyco Int'l Mgmt. Co., LLC*, 262 F. Supp. 3d 1328, 1340 n. 6 (S.D. Fla. 2017) (Marra, J.) (same) (citing *Burns v. Medtronic, Inc*., 2016 WL 3769369, at *5 (M.D. Fla. July 12, 2016) and *Canalejo v. ADG, LLC*, 2015 WL 4992000, at *2 (M.D. Fla. Aug. 19, 2015)); *Villaman v. United Parcel Service, Inc*., 2019 WL 922704, *6 n. 2 (S.D. Fla. Feb. 8, 2019) (Altonaga, J.) ("For purposes of summary judgment, the Court assumes the reading in *Aery* is the correct one—Plaintiff must only prove she had a good faith reasonable belief in the violation of law at the time she objected to the Defendants.").[3]   The "good-faith belief" standard is the correct one.

## II.    JURY QUESTION ON LIABILITY OF BOTH DEFENDANTS UNDER PUBLIC WHISTLEBLOWER ACT

### A.  APC Was A Contractor

The court maneuvered APC out of the private whistleblower's act by stating *ipse dixit* that APC was not a joint employer of Scott with Centurion and that the violations were Centurion's. Next it maneuvered APC out of the public whistleblower act by saying its contract is not covered by the statute because it is a

---

[3] Employers have taken some comfort in *Graddy v. Wal-Mart Stores E., LP*, 237 F. Supp. 3d 1223, 1227-28 (M.D. Fla. 2017), which rests on the unusual proposition that dicta is enough to create conflict between the Florida DCAs, thereby placing *Kearns* on equal footing with *Aery*.

subcontract. But that is exactly backwards. The point is not that the statute is silent on subcontractors. It is because subcontractors are a form contractor. So the point is that the statute is silent on including only general or prime contractors. As a matter of statutory interpretation, it is improper construction to insert the word "prime' or the word "general" before "contractor. It was error for the court below to amend that language into the statute, as is made clear by both federal and state controlling authority. *Arlington Cent. School Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 307 (2006) ("we are not at liberty to rewrite the statutory text adopted by both Houses of Congress and submitted to the President . . . to add several words Congress wisely might have included.") (internal cite omitted); *Seagrave v. State*, 802 So.2d 281, 287 (Fla.2001) ("[I]t is a basic principle of statutory construction that courts 'are not at liberty to add words to statutes that were not placed there by the Legislature.'").

Centurion contracts with the State to operate health care services for the State prisons. APC, in turn, contracts with Centurion to provide consultant pharmacist services to those prisons. But APC's role is dictated by the state, as confirmed by Centurion's Senior Vice President for Operations, Victoria Love, in her deposition. Ms. Love testified that the contract between Centurion and the state requires Centurion to retain an independent outside consulting pharmacist to monitor the prison pharmacies. This outsourcing exists to provide objectivity to the monitoring.

ECF No. 62-4, Love depo at 4 (13:3-16). So the contract between Centurion and APC is mandated by the State of Florida through its contract with Centurion. The APC/Centurion contract is thus a state-mandated contract even if it is not formally a state contract. The law does not permit Centurion to escape the strictures of the whistleblower law merely by contracting out certain functions. The Supreme Court of Florida has instructed courts to construe the FWA broadly and to favor access to its remedy. *Irven v. Dep't of Health and Rehab. Servs.*, 790 So. 2d 403, 406 (Fla. 2001); *Martin County. v. Edenfield*, 609 So. 2d 27, 29 (Fla. 1992). The compliance monitoring of prison pharmacies can be quite literally a matter of life or death. These functions are at the very heart of the public health, safety, and welfare that the Act is designed to protect. The law cannot be read in so crabbed a fashion as to exclude APC employees from its protection.

If the law were otherwise, Centurion could simply outsource any questionable activities for which it seeks to escape liability. The contract could be to a judgment-proof subcontractor so Centurion would be immune from liability and all victims would go without redress or remedy. That could not have been the state's policy when it mandated the existence of this special kind of subcontract. As stated above, the purpose was that Centurion could not objectively monitor its own pharmacy. The state cannot mandate that a function be outsourced and at the same time create

an exempt status for the entity that takes on the outsourced function.  The summary judgment order justifies this immunity by saying that such entities would be covered by the private whistleblower act. ECF No. 106, at 11-12.  Mind you, this is the same summary judgment order that immunized APC under the private whistleblower act.

## B. <u>Disclosures in Written Reports Qualify As Protected Activity</u>

The summary judgment order disqualifies the disclosures and complaints made in Scott's written reports because she was required to submit these reports as part of her job.  Thus the disclosures were not "on her own initiative" and thus fell outside the protection of the act.

But there is a controlling case holding the opposite on this exact point. *Igwe v. City of Miami*, 208 So. 3d 150 (Fla. 3d DCA 2016).  The *Igwe* court keyed in on the "on their own initiative" language, finding that to interpret that language as excluding disclosures made in the course of an employee's mandatory reporting, is at odds with two provisions of the statutes.  One is the protection of "**any person**" who properly discloses "improper use of governmental office, gross waste of funds, or any other abuse or gross neglect of duty on the part of an agency, public officer, or employee." *Id*. at 155, quoting § 112.3187(2) (court's emphasis).  The *Igwe* court pointed out that "any person" is language that "clearly encompasses those who make disclosures because it is their job to do so."  The court's second point is that this is

39

an example of a situation requiring application of the legislative mandate of liberal construction of the statute to effectuate access to the remedy as discussed *supra* in *Irven* and *Martin County*.

The summary judgment order had earlier minimized the doctrine of liberal construction, as a few other courts are doing to the detriment of separation of powers and respect for the legislative function. That a court would see a disclosure in a mandatory report as something that could not be on an employee's own initiative is simply an example of wanting a conclusion. The writing of a report is perhaps not on one's own initiative, but the inclusion of whistleblower comments in that report certainly is. This is a regrettable example of a tendency throughout the order to search for conclusions favorable to the employers.

## C. <u>Scott participated in an Inquiry</u>

The court below excludes Scott from the category of persons in § 112.3187(7) "who are requested to participate in an investigation, hearing, or other inquiry conducted by any agency." The court grants that the inspections Scott performed were inquiries, but says these inspections were conducted by Scott, not by an "agency." This is a word game. The inspections were conducted at the mandate of the Department of Corrections. DOC contracted the function out to APC, who sent Scott to do the inspections. So they were DOC inspections, whether done by DOC

personnel or by those to whom DOC outsourced the function. That, too, is the kind of reading required by the liberal construction mandate.

In addition to Scott's protected speech in the inspections mandated by the State, there is also her direct complaint to the Department of Health. The summary judgment order disqualifies this activity on the ground that the complaint originated in a call to DOH by Scott, not a call to Scott by DOH.

This is a repeat of the same error made in the summary judgment order regarding a similar provision of the private whistleblower act, as discussed above in the section on Section 448.102(2), which protects an employee who has "provided information to, or testified before, any appropriate governmental agency, person, or entity conducting an investigation, hearing, or inquiry into an alleged violation of a law, rule, or regulation by the employer." Again, the court reads into this statute a requirement that the inquiry being conducted must be at the agency's initiative. In accordance with this self-made amendment, the court excludes Scott's telephone call to the Department of Health to report violations of law, rule, and regulation by both Centurion and APC because "At the time of the call, the Department was not conducting an inquiry, let alone an investigation or hearing." But common sense, to say nothing of liberal construction, forbids inserting that sort of restriction. If the Department had called back in a day or two and asked Scott some questions, nobody

would dispute that was an inquiry by the Department.  But since the Department asked the questions in the call Scott initiated, the court below reaches a different conclusion.  That violates simple linguistics as well as the reasoning Florida courts have applied to the public whistleblower statute.  See *Martin County v. Edenfield*, 609 So.2d 27 (Fla. 1992) (disclosures made in discussions with County Commissioners qualify under the statute as protected activity); *Shuck v. Clark*, 2007 WL 676198 (M.D. Fla. 2007) (verbally disclosing actual or suspected violations of laws or rules during interview with the defendant's City's Employee Relations Department qualifies under the Act); *Jones v. School Bd. of Orange County, Fla*., 2005 WL 1705504 (M.D. Fla. 2005) (a non-disciplinary, "troubleshooting" meeting with management counts as an "inquiry" under § 112.3187(7), Florida Statutes).

### D. <u>Scott Made Complaints to Supervisory Officials</u>

The trial court grants that Scott's complaints were "complaints" and that they were written.  But the court balked at saying they were about Scott's employer because the written complaints were about Centurion, not APC.  The joint employer issue, discussed above, applies here and need not be repeated.  But there is another relevant body of Florida public whistleblower law that comes into play.

The leading and controlling case is *Kogan v. Israel*, 211 So.3d 101, 107-08 (Fla. 4th DCA 2017) (agency "is not limited to the particular  agency that employs

the Whistle-blower").  The *Kogan* court explained that, "[t]here is nothing in the text which limits the nature of the disclosed information to information concerning the discloser's own agency … Clearly, this includes the full spectrum of Florida state and local government and is **not limited to the particular agency that employs the Whistle-blower**." *Id*. (emphasis added).

### III.  TRIAL COURT'S FAILURE TO PENALIZE SPOLIATION OF EVIDENCE

APC gained an unfair advantage by destroying key evidentiary documents. Scott brought this to the trial court's attention in the summary judgment briefing, but the court left it not only unredressed, but unmentioned.

APC was aware that Scott levied complaints with the Florida Department of Health as of August 28, 2018. ECF No. 56-3 at 228 (227:18-20).[4] As of September 4, 2018, Mason told her supervisors that she has "to put together a timeline of events since she is most likely working with an attorney." ECF No. 62-22. Mason's work experience led her to believe that Scott had an attorney because of Scott's claims of being targeted and retaliated against. ECF No. 56-3 at 183, 227-228 (182:16-24, 226:24-227:4). APC does not have any document retention policy. *Id*. at 228 (227:5-8). And despite believing the Scott had retained a lawyer regarding her complaints

---

[4] Andrea Mason served as the Rule 30(b)(6) witness for Defendant APC. ECF No. 56-3 at 12-13 (11:9-12:3).

of retaliation, APC made no attempt to retain Scott's emails after her termination. *Id*. at 228 (227:9-11). In fact, the opposite is true, APC deleted all of Scott's emails on December 26, 2018. ECF No. 62-24 at 5-6, Amended Response to No. 8.

Spoliation sanctions "are intended to prevent unfair prejudice to litigants and to insure the integrity of the discovery process." *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005). The District Court had "broad discretion" to impose sanctions for spoliation of evidence. *Id.* The nature of the sanction depends on a finding that Defendant acted with the "intent to deprive another party of the information's use in litigation." If so, and the evidence cannot be restored through additional discovery, then the court could have issued a sanction ranging from an adverse jury instruction to entry of a default judgment. *See* Fed. R. Civ. P. 37(e)(2).[5] Even without a finding of bad faith, a court can issue orders to cure any prejudice suffered by the Plaintiff. *See id*.

Here, Plaintiff was prejudiced by the wholesale deletion of her emails by APC. While it is true that Plaintiff retained some of her emails, it is not her entire account. ECF No. 56-2 at 9 (8:20-23); ECF No. 62-1, ¶ 16. The emails could have shown that

---

5  The 2015 amendment to Fed. R. Civ. P. 37(e) provides the rules and remedies for the failure to preserve electronically stored information. *See Alabama Aircraft Indus., Inc. v. Boeing*, 319 F.R.D. 730 (N.D. Ala. 2017) (explaining that Rule 37(e) applies to civil cases commenced after December 1, 2015).

Scott did not engage in alleged misconduct, thus showing pretext for APC's claims. For example, some emails are missing the entire thread and Scott does not have the ability to rebut arguments by showing the complete conversations. ECF No. 56-2 at at 14 (13:5-9). In particular there could have been emails detailing her attendance and meeting requirements at the Ridgeview Hospital. *Id*. at 15 (14:10-14:24). There could also be additional emails concerning the completion of alleged reviews and updated policies and procedures at various private facilities, or emails concerning the completion of performance reviews of subordinates.

APC was aware of the possibility of litigation prior to terminating Scott's employment. Indeed, it took its own acts to document alleged or perceived deficiencies by Scott, cherry-picked these emails that it believes bolsters its position in terminating Scott, and *then* deleted her email account. The prejudice suffered by Scott cannot be cured through any additional discovery. Upon a finding that APC intentionally deprived this information, the court could have presumed that the evidence in her email account would have been favorable to Scott, or unfavorable to APC, instructed the jury that it may presume the evidence is unfavorable to APC, or issue the most severe sanction of default. *See* Fed. R. Civ. P. 37(e)(2). Scott moved for an adverse inference at summary judgment – and inference strong enough to deny the summary judgment motion -- and a spoliation instruction to the jury as an

45

appropriate remedy to cure the prejudice suffered. That motion has still not been addressed. This court should direct that, on remand, evidence be taken and a decision made.

## CONCLUSION

This Court should accept the trial court's jurisdictional certifications. This court should reverse summary judgment on every count on which it was granted.

Scott has demonstrated the existence of a jury question on the liability of both Defendants under the Florida Private whistleblower act by showing Centurion's joint employer status with APC, by showing that her information provision qualifies as statutorily protected activity, and by showing that her objections were statutorily protected activity.

Scott has further demonstrated the existence of a jury question on the liability of both Defendants under the Florida Public Whistleblower Act by showing that APC meets the definition of a state contractor, that Scott's disclosures in her written reports qualify as statutorily protected activity, that the actions in which Scott participated count as "inquiries" under the statute, and that Scott made complaints to supervisory officials.

On remand, the trial court should be directed to conduct an inquiry into APC's spoliation of evidence and to take appropriate action on it.

Respectfully submitted,


  /s/ Richard E. Johnson
Richard E. Johnson
Florida Bar No. 858323
Law Office of Richard E. Johnson
314 West Jefferson Street
Tallahassee, FL 32301
Telephone:  (850) 425-1997
Facsimile:   (850) 561-0836
rick@rej-law.com

Lisa C. Lambert
Florida Bar No. 495298
425 North Highland Avenue
Suite 230-139
Atlanta, Georgia 30307
404-556-8759
lisa@civil-rights.attorney


Attorneys for Plaintiff/Appellant

## CERTIFICATE OF COMPLIANCE

I hereby certify in accordance with FRAP 32(a)(7)(c) that this brief complies with the type-volume limitation specified in Rule 32(a)(7)(B). Specifically, it contains 10,650 words in the Brief.

 /s/ Lisa C. Lambert
Lisa C. Lambert

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been sent via CMF and U.S. Mail to the attorneys identified below this 27th day of June 2022:

Catherine Molloy
molloyk@gtlaw.com
Andrea Nieto
nietoa@gtlaw.com
Jennifer Corinis
corinisj@gtlaw.com
Greenberg Traurig, PA
101 E. Kennedy Boulevard
Suite 1900
Tampa, Florida 33602


B. Tyler White
tyler.white@jacksonlewis.com
Katherine Brezinski
Katherine.brezinski@jacksonlewis.com

Jackson Lewis P.C.
501 Riverside Avenue
Suite 902
Jacksonville, Florida 32202


 /s/ Lisa C. Lambert
Lisa C. Lambert